1

2    UNITED STATES BANKRUPTCY COURT

3    EASTERN DISTRICT OF NEW YORK

4    Case Nos. 09-49040(CEC); 09-51313(CEC); 10-44189(CEC)

5    - - - - - - - - - - - - - - - - - - - - - - - - - -x

6    In the Matters of:

7    PREVENTION I, INC.,

8                        Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - -x

10   304 WASHINGTON AVENUE, INC.,

11                       Debtor.

12   - - - - - - - - - - - - - - - - - - - - - - - - - -x

13   MICHAEL I. FISCHMAN and SHOSHANNA FISCHMAN,

14                       Debtors.

15   - - - - - - - - - - - - - - - - - - - - - - - - - -x

16                        United States Bankruptcy Court

17                        271 Cadman Plaza East

18                        Brooklyn, New York

19

20                        November 3, 2010

21                        3:27 PM

22

23   B E F O R E:

24   HON. CARLA E. CRAIG

25   CHIEF U.S. BANKRUPTCY JUDGE

1

2  ORDER Scheduling Status Conference for the Purpose of

3  Determining an Appropriate Schedule for the Proper

4  Administration of This Case (09-49040(CEC) [9])

5

6  MOTION to Dismiss Case or, in the Alternative, Convert Chapter

7  11 Case to Chapter 7 (09-49040(CEC) [25])

8

9  ORDER Scheduling Status Conference for the Purpose of

10  Determining an Appropriate Schedule for the Proper

11  Administration of This Case (09-51313(CEC) [10])

12

13  MOTION to Dismiss Case or, in the Alternative, Convert Chapter

14  11 Case to Chapter 7 (09-51313(CEC) [64])

15

16  MOTION to Dismiss Case or, in the Alternative, Convert Chapter

17  11 Case to Chapter 7 (10-44189(CEC) [50])

18

19  ORDER Scheduling Status Conference for the Purpose of

20  Determining an Appropriate Schedule for the Proper

21  Administration of This Case (10-44189(CEC) [7])

22

23

24

25  Transcribed by:  Lisa Bar-Leib

```
 1

 2   A P P E A R A N C E S:

 3   WAYNE GREENWALD P.C.

 4         Attorneys for Debtors

 5         475 Park Avenue South

 6         26th Floor

 7         New York, NY 10016

 8

 9   BY:   WAYNE GREENWALD, ESQ.

10

11   UNITED STATES DEPARTMENT OF JUSTICE

12         Office of the United States Trustee

13         271 Cadman Plaza East

14         Suite 4529

15         Brooklyn, NY 11201

16

17   BY:   WILLIAM E. CURTIN, ESQ.

18

19   POLSINELLI SHUGHART PC

20         Attorneys for City National Bank

21         7 Penn Plaza

22         New York, NY 10001

23

24   BY:   JASON A. NAGI, ESQ.

25
```

1                    P R O C E E D I N G S

2              THE CLERK:  Calling Fischman, Prevention I and 304

3    Washington.  Appearances, please.

4              MR. GREENWALD:  Good afternoon, Your Honor.  Wayne

5    Greenwald with Wayne Greenwald, P.C., attorney for the debtors.

6    Also with me is Michael Fischman, who is one of the debtors'

7    principal corporate debtor, and Hal Korcarz who is the

8    accountant.

9              MR. CURTIN:  William Curtin for the United States

10   trustee, Your Honor.

11             MR. NAGI:  Jason Nagi from the law firm of Polsinelli

12   Shughart on behalf of City National Bank, Your Honor.  We filed

13   notices of presentment for us to be substituted as counsel in

14   In re Fischman.  And we also filed a notice of appearance in

15   the --

16             MR. GREENWALD:   Prevention I.

17             MR. NAGI:  -- Prevention I matter.  We can present

18   Your Honor with chambers copies at this time if Your Honor

19   would like.

20             THE COURT:  That's not necessary.

21             MR. NAGI:  Thank you.

22             THE COURT:  You may be seated.  All right.  Mr.

23   Curtin, should we start with your motion?

24             MR. CURTIN:  Thank you, Your Honor.  William Curtin

25   for the United States trustee.  Your Honor, we have two

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

Page 5

1    recently filed motions or semi-recently filed motions and one

2    motion that's been pending for some time.  What we're seeking

3    is conversion of all three cases:  the Fischman case, 304

4    Washington Avenue Inc. and Prevention I.  Your Honor, all of

5    these -- this story started in this Court approximately a year

6    ago.  And Mr. Fischman, of course, is the principal of

7    Prevention I which was the first case to file.  So he has been

8    before Your Honor in one capacity or another for at least a

9    year.  And that will become relevant when I address the

10   opposition that was filed.

11            I'd like to start with the Fischman cases, Your Honor,

12   because the other cases are, of course -- the facts are

13   similar.  Your Honor, we seek dismissal of the Fischman under -

14   - for several reasons.  The first has to do with -- and I'll

15   start with the easier grounds.  One has to do with the timely

16   filing of operating reports.  Your Honor, at this time, the

17   operating reports that are outstanding have been filed but they

18   have been consistently filed in an untimely manner.

19            Secondly, with regard to orders, disobeying orders of

20   the Court, 1112(b)(4)(E), there are two orders that we raise in

21   the motion.  And in fact, as I'll go through when I go through

22   the opposition, the debtor, in fact, admits that it has not

23   followed those orders.  Those two orders are, first, the con --

24   what we refer to as the controlled entity reporting order which

25   Your Honor is familiar with because Mr. and Mrs. Fischman are

1    individual debtors and they own or control certain nondebtor

2    entities, they're required to -- under Rule 2015, as well as

3    the order expanding the requirements of 2015 that the Court

4    entered they're required to file controlled entity reports

5    regarding those nondebtor entities.  They filed certain of

6    those reports.  However, they did not file the report as the

7    motion points out for an entity called Carriage House.  And

8    again, I'll get into that when I go through the opposition.  If

9    Your Honor will indulge me, I'd like to go through the

10   opposition.

11           THE COURT:  Okay.  Give me the date when that order

12   was entered.  And this is entered in the Fischman individual --

13           MR. CURTIN:  This is entered in the Fischman matter,

14   Your Honor.  Just give me one moment.  It should be ECF number

15   19, Your Honor.  It should have been entered on July 2nd, I

16   believe.

17           THE COURT:  Okay.  Thank you.

18           MR. CURTIN:  And the second order, Your Honor, which

19   in the opposition which I'll go through, the debtor admits it

20   didn't follow is the order that Your Honor entered for Fannie

21   Mae's -- in granting Fannie Mae's motion to lift the stay and

22   requiring certain documents be turned over both to Fannie Mae

23   and also to the United States trustee by date certain which, of

24   course, didn't happen.  The information purportedly is provided

25   or attached to the opposition.  I haven't been able to reach

1    Fannie Mae's counsel and they're not here today so I don't know

2    if that's exactly what was supposed to be provided, but, quite

3    frankly, it's irrelevant.  And just for the record, I'm

4    referring to the August 26th order of this Court which is ECF

5    number 48 on the docket which required, in relevant part, the

6    debtors to provide an accounting which I refer to in the motion

7    as the Yakaputz accounting to the Court, Fannie Mae and the

8    United States trustee no later than September 1st, 2010,

9    identifying the sources and use of all rents and security

10   deposits that came into the debtors' possession after the

11   petition date.  And as I mentioned, that did not happen,

12   certainly did not happen even remotely timely and still I'm not

13   even sure whether it actually did happen.

14          The -- with regard to the gross mismanagement, Your

15   Honor, we lay out literally pages of examples of gross

16   mismanagement.  But it really -- it centers around the debtors'

17   use of an entity, a nondebtor entity known as Albany Commons,

18   which is purported to be a management company and in many

19   senses does operate as a management company for the debtors'

20   properties.  However, in looking at the reports that were filed

21   by the debtor, both the operating repots and the controlled

22   entity reports, it became apparent that funds were coming in to

23   Albany Commons from the various real estate entities including

24   the two debtor entities, 304 Washington and Prevention I, and

25   then going out of Albany Commons to pay personal expenses.  So,

1    as I point out in the motion, it's somewhat of a new twist on

2    an old story where it's not the debtor paying the personal

3    expenses but it's really the same thing because the money's

4    coming in and then going out to pay those personal expenses.

5         Your Honor, if you'll indulge me, I'd just like to go

6    through the opposition because I think it's relevant in the

7    sense that it admits many -- many of the allegations, the

8    factual allegations that are raised in the motion.  And my

9    position would be that based upon those admissions, all that's

10   left is for the Court to make a legal determination as to

11   whether those allegations, as admitted, constitute cause to

12   convert this case.

13        And, Your Honor, I'll just -- for -- trying to figure

14   out the easiest way to do this, I think I'm just going to go

15   through the opposition in order by paragraph I think is really

16   the only way to do it because as Your Honor can tell, there's a

17   lot of facts here and there -- it's really -- it seems more

18   burdensome than it is.  When it's boiled down, it's really not

19   very complicated.

20        First of all, the debtors admit, paragraph 8 and in

21   paragraph 9, they make the statement that "The Debtors, through

22   the reorganization process, are learning how to manage their

23   entities better."  Your Honor, I couldn't let that go without

24   commenting.  Obviously, the Court knows that this is not -- the

25   purpose of Chapter 11 is not for a debtor to learn how to

1    operate its entities.  And even if it is, even if some argument

2    could be made that in the initial stages of the case that may

3    be the practical reality, as I pointed out, Your Honor, the

4    debtors' principal and the debtor have been before the Court in

5    one capacity or another for a year.  There's three pending

6    bankruptcy cases.  And as they admit in paragraph 8, they, at

7    least for the past several months, have had the assistance of

8    an accountant.  So the we-made-a-mistake excuse, which comes up

9    over and over again in the opposition, is not even as

10   compelling as it might be in other situations.  And remarkably,

11   in paragraph 18, the debtor talks about now employing two

12   bookkeepers with whom he works daily -- again, as we point out,

13   the money in this case is extremely tight and now we're talking

14   about two additional employees.  And as I pointed it out, even

15   up through the September operating reports which are the most

16   recent that we have, the mismanagement continues.  Okay.

17            With regard to the debtors' allegation on -- in

18   paragraph 27 which states, and I'll read, "It was agreed upon

19   by the Debtors' professionals and the Trustee's office that

20   continuing Albany Commons as management for the Debtors' four

21   Albany, New York properties was appropriate."  Now that's not

22   entirely accurate, Your Honor.  The Albany Commons' existence,

23   of course, was disclosed to the U.S. trustee and to the Court

24   and the debtor has been reporting.  But what the debtor seems

25   to misunderstand is that reporting alone is not what's

1    required.  The reporting gives us the information.  And when we

2    discovered the mismanagement based upon the reporting, it

3    doesn't mean that just because the reporting was okay that

4    everything is okay.

5            Secondly -- and this would be one of the admissions

6    that I was pointing out with regard to the 1112(b)(4)(E) cause

7    of action.  And that's at paragraph 29 and 30.  It admits that

8    no controlled entity reports were filed for Carriage House.

9    And somewhat incredulously in paragraph 30, it says that the

10   debtor was not aware or did not remember hearing during the

11   trustee's initial meeting that reports for this entity were

12   required.  Now certainly, this reporting was discussed at the

13   meeting.  But the obligation, of course, comes from both the

14   Code -- or, I'm sorry, the rules and this Court's order which

15   says all entities and I believe might even mention them by

16   name.

17           THE COURT:  Well, let's look.

18           MR. CURTIN:  I was going -- I don't have the order

19   itself.

20           THE COURT:  I'm looking at it.

21           MR. CURTIN:  I believe that -- and --

22        (Pause)

23           THE COURT:  Okay.  No.  That's a different order.

24           MR. CURTIN:  Your Honor, but when I sit down --

25           THE COURT:  Give me the date on that order again.

1          MR. CURTIN:  July 2nd, Your Honor.  And I have it

2     somewhere in that stack.  When I sit down, I'm sure I can find

3     it.

4          (Pause)

5          THE COURT:  It was -- the order directed the debtors

6     to file reports containing information with regards to any

7     entity in which there holds a controlling or a twenty percent

8     interest including the entities which included -- which were

9     named --

10          MR. CURTIN:  And, Your Honor --

11          THE COURT:  -- and which specifically included

12     Carriage House Development.

13          MR. CURTIN:  Okay.  Thank you, Your Honor.  I

14     apologize for not having that order --

15          THE COURT:  No.  Go ahead.

16          MR. CURTIN:  -- in front of me.  Next, Your Honor --

17     the next admission comes at paragraph 36 and 37.  And that

18     refers to the August 26th order which, as I read before,

19     required the accounting to be turned over to -- to be filed

20     with the Court and turned over to us and turned over to Fannie

21     Mae's counsel.  And in paragraph 37, the debtor admits that it

22     failed to provide that accounting.

23          Moving on to -- and, Your Honor, I kind of glossed

24     over it but in the beginning of the motion, the debtor

25     discusses -- let's find the paragraph -- with regard to the

1   operating report allegation -- I refer Your Honor to paragraph

2   10 regarding preparing the monthly operating reports being an

3   onerous task, and 13, where he says there were improvements in

4   filing the report.  And specifically, number 12 where it says

5   that the reports were not submitted in as timely a manner as

6   the debtor would have liked.  While it's not as clear an

7   admission as some of the others, it certainly acknowledges that

8   the reporting in this case hasn't been timely.

9        Your Honor, with regard to the gross mismanagement

10  that's alleged in the motion, the admissions with regard to

11  that cause of action start on paragraph 41 on page 6 of the

12  opposition.  And I want to point Your Honor's attention to

13  certain words in the opposition starting in paragraph 42 where

14  the debtors -- it talks about the Fischmans using Albany

15  Commons debit card when they either had no cash available or an

16  item, and I quote, "usually construction related".  So, in

17  other words, they're saying that in certain cases as we point

18  out, these expenses were not construction or real estate

19  related.  The debtors then going into, starting at paragraph

20  43, the fact that they do not have a credit or debit card and

21  that the debit or credit card of Albany Commons had to, in

22  their position -- their position is that the Albany Commons

23  debit card had to be used for these expenses because they

24  didn't have another card.  Your Honor, it's not a convincing

25  argument.  It's still -- the bottom line is that personal

1    expenses were paid from Albany Commons.  We've pointed them out

2    in the motion.  They -- the debtors state, at paragraph 44,

3    that the items have been paid back to Albany Commons.  However,

4    as we progress through the opposition, you'll see that they

5    even admit that they haven't all been paid back.  And I would

6    submit to you that paying it back is great.  It's still gross

7    mismanagement to do it in the first place.  But it certainly is

8    gross mismanagement when certain of those expenses haven't been

9    repaid.  And specifically, I would refer Your Honor to

10   paragraph 54 where the opposition states that "there was one

11   personal expense of $179.50 for theater tickets which has not

12   been repaid" -- I'm sorry -- "which was not repaid".  And also

13   paragraph 55, where the debtor talks about an approximately

14   thirty dollar payment to Club Penguin for a personal expense

15   related to the debtors' daughter which also is not repaid.

16        Those are the outright admissions.  And then we get,

17   in paragraph 53, an admission that a personal expense for a car

18   for Mr. Fischman was paid -- a rental car for Mr. Fischman of

19   just over 300 dollars was paid.  And then, if Your Honor will

20   recall in the motion, a couple of the expenses that we pointed

21   out as examples were from a spa facility.  The debtor alleges

22   that the spa charges, of which there were a few, were for

23   treatment of an injury incurred during construction.

24        Your Honor, moving on and again focusing on the

25   language of the opposition, in paragraph 691, the debtor notes

1    that we questioned a $573.67 expense.  And the debtors'

2    response to that is the debtors believe that these monies were

3    used for building supplies for 304 Washington Avenue -- again,

4    a debtor with an accountant, with an attorney that's been

5    before Your Honor for over  a year.

6           Moving on, Your Honor, to another example beyond the

7    comingling of gross mismanagement and that is the hiring and

8    payment of professionals without a court order.  Your Honor, we

9    raised that in the motion.  And in paragraphs 74 and 75, the

10   debtors admit that they did, in fact, retain this appraiser and

11   did, in fact, pay the appraiser and they didn't seek court

12   approval for either the retention or for the payment.

13          Going back to the comingling piece of the gross

14   mismanagement and moving on to the next phase of the

15   opposition, in paragraph 77, when we point out certain

16   discrepancies between the rent roll and the reported income of

17   which there are several which continue to this day, the

18   debtors' response is, "It is apparently the result of a vacant

19   apartment."  Again, Your Honor, a debtor that's been a debtor-

20   in-possession in some capacity for a year.

21          And similarly, paragraph 79, under the -- I'm sorry.

22   Let me -- yes.  Paragraph 79, where the debtor responds to an

23   allegation saying "Nine dollars was paid to an accountant to

24   correct an error made by a bookkeeper who was later

25   discharged."  No information about who this bookkeeper is, what

1    the payment was for, so on and so forth.

2           And lastly, Your Honor, in paragraph 83 -- lastly with

3    regard to the admissions, paragraph 83 discusses an issue that

4    may be familiar with the Court.  I believe it came up during a

5    hearing regarding the unauthorized loan.  It gives a reason; it

6    gives an excuse.  Whatever it is, it is.  But it admits that

7    there was an unauthorized loan.

8           Your Honor, the -- we would submit that based upon the

9    allegations that we made in the motion coupled with the

10   admissions that are made in the opposition, Your Honor has a

11   clear picture of undisputed facts; in a sense, a stipulation of

12   facts.  And the remaining job to be done is a legal

13   determination as to whether, under 1112(b)(4)(B), (F) and (E),

14   cause exists to convert these cases.  And we would submit to

15   the Court that cause does exist and that the cases must be

16   converted.

17          I'll just -- just briefly, the dismissal versus

18   conversion conundrum, in the case of 304 Washington and, to a

19   lesser extent, Prevention I, under different circumstances I

20   may be advocating for dismissal.  However, since these cases

21   are -- we do have the three related cases.  I think that there

22   are, or at least may be, assets in the Fischman matter for a

23   trustee to liquidate for the benefit of creditors.  And, of

24   course, if the trustee chose to do so, he or she could operate

25   the business for some time.  So the point of this is that I

1   think it makes sense to take the same action with each of the

2   three cases and convert.

3            THE COURT:  Well, if a trustee's appointed in the

4   Fischman case, and Mr. Fischman is the hundred percent owner --

5            MR. CURTIN:  Correct.

6            THE COURT:  -- of each of these entities.

7            MR. CURTIN:  So it's --

8            THE COURT:  So the trustee would then become --

9            MR. CURTIN:  Even absent conversion of the two --

10           THE COURT:  -- person who is in control of --

11           MR. CURTIN:  -- other cases, that's correct, Your

12   Honor.  So for practical purposes, it would be the same thing.

13   So that's --

14           THE COURT:  And it would be up to that -- that trustee

15   could decide at that point whether he wanted to convert the

16   other two cases -- or she.

17           MR. CURTIN:  Right.  That could -- I think there's

18   cause in all three cases, but yes, to answer Your Honor's

19   question.

20           THE COURT:  In other words, we don't have to get into

21   the facts of the other three cases.

22           MR. CURTIN:  Right.  And, Your Honor, the facts are

23   similar because, again, it all goes back -- but yes, that's

24   correct.

25           THE COURT:  Okay.  Thank you.

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1          MR. CURTIN:  Subject to Your Honor's questions, that's

2    all I have.

3          THE COURT:  No.  I don't have any questions at this

4    time.

5          MR. CURTIN:  Okay.  Thank you, Your Honor.

6          MR. GREENWALD:  Good afternoon, Your Honor.  Wayne

7    Greenwald for the debtors.  Initially, Your Honor, I apologize

8    for the timing of the filing of the response.  I was not well

9    and I had a difficulty.  But I want to apologize for it

10   nonetheless.  I understand that they were read and I thank you

11   for doing that.  Thank you.

12         As far as 304 Washington and --

13         THE COURT:  Let's talk about Mr. Fischman's case.

14         MR. GREENWALD:  Okay.  On the Fischman case, number

15   one, these debtors are honest debtors.  They've disclosed

16   everything.  They've been completely transparent about what's

17   going on.

18         THE COURT:  That's not really true, actually.  That's

19   not really true.

20         MR. GREENWALD:  Where is Your Honor seeing that they

21   were not transparent?

22         THE COURT:  Well, they didn't provide the reports that

23   they were supposed to provide on Yakaputz on the day that --

24   when they were supposed to provide it.  And they didn't provide

25   operating reports on Carriage House at all.

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1        MR. GREENWALD:  Your Honor, number one, for Yakaputz,

2    Yakaputz was provided to the receiver.  The Yakaputz accounting

3    was provided to the receiver in the beginning of October.  And

4    it states in there that we had provided it to the receiver as

5    long as all monies are there required.

6        THE COURT:  The order that was required -- the order

7    that was entered

8        MR. GREENWALD:  There's no question that it happened

9    after the date the order required, Your Honor.

10        THE COURT:  Well, it wasn't -- and it was required --

11    let's see.  Print that order out, would you, Tracy?  All right.

12    That's this order.  All right.  That by no later than September

13    1, 2010, the debtors are required to deliver to an accounting

14    to the Court, Fannie Mae and the Office of the United States

15    Trustee for the sources and uses of all rents and security

16    deposits that came into their possession, trust and control

17    after the petition date.  That wasn't done.

18        MR. GREENWALD:  Your Honor, that wasn't done on time

19    but it was done.

20        THE COURT:  When was it done?  Was that ever filed

21    here?

22        MR. GREENWALD:  I don't believe that I filed it here.

23    However, it was provided to the receiver.

24        THE COURT:  Well --

25        MR. GREENWALD:  I did not receive a copy.

1          THE COURT:  If it wasn't provided --

2          MR. GREENWALD:  I did not --

3          THE COURT:  The order requires it to be provided --

4   provide a delivery and accounting to the Court.  Now that means

5   file it on the docket.  Or send it -- but you send it to Court,

6   right?  I remember what you did with Fannie Mae.  But you

7   apparently didn't provide it to the Office of the United States

8   Trustee.  And -- ever.

9          MR. GREENWALD:  Okay.

10         THE COURT:  So that is an order of the Court that was

11  not complied with.  And that, under Section 1112 --

12         MR. GREENWALD:  Can be cause.

13         THE COURT:  Is cause.

14         MR. GREENWALD:  All right.  Is -

15         THE COURT:  Is cause.

16         MR. GREENWALD:  Is defined as --

17         THE COURT:  Cause includes --

18         MR. GREENWALD:  Is defined as one that would make good

19  cause.

20         THE COURT:  -- failure to comply with an order of the

21  Court.  There was an order of the Court.  It wasn't complied

22  with.  And it was an order that required disclosure and an

23  accounting and it wasn't complied with.  So to stand there and

24  tell me that these debtors have disclosed everything is simply

25  not accurate.

1          MR. GREENWALD:  Well, they disclosed it but they

2     disclosed it late.

3          THE COURT:  They didn't disclose it to the Court and

4     they didn't disclose it to the U.S. trustee.

5          MR. GREENWALD:  Well, Your Honor, it is also contained

6     in our response.

7          THE COURT:  Well, if it's two months late, it's not

8     timely.

9          MR. GREENWALD:  Your Honor --

10         THE COURT:  The order --

11         MR. GREENWALD:  -- the fact --

12         THE COURT:  An order -- a deadline in an order is not

13     just --

14         MR. GREENWALD:  I'm --

15         THE COURT:  -- a guideline.

16         MR. GREENWALD:  No argument with that, Your Honor.

17         THE COURT:  Okay.  Whether or not it's in your

18     response or adequately covered in your response, it's sixty

19     days late.

20         MR. GREENWALD:  You're --

21         THE COURT:  And that's not compliance with an order of

22     this Court.

23         MR. GREENWALD:  Your Honor, if you'll recall, I said

24     that they had been transparent, that many of the things that

25     the trustee was able to -- was able to say is because they gave

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1    complete disclosure of all of their finances that were going

2    on.  They've been candid; they have been honest.  Carriage

3    House?  Carriage House has not been in operation.  And that was

4    their mistake.  But upon learning that they had to go do it for

5    inactive entities, they prepared an MOR for the Carriage House.

6    But they have been providing MORs at beginning.  MORs and the

7    controlled entity reports were late, unquestionably.

8    Unquestionably.  But that lateness was decreased.  To the

9    extent that September was filed on time -- we expect to file

10   October early.  And for August, it was two days late.  They now

11   have it under control.

12          THE COURT:  Okay.  Mr. Greenwald, 1112 is pretty clear

13   as accurate -- was amended in 2005.  It's pretty clear what

14   constitutes cause.  Failure to comply with an order of the

15   Court constitutes cause.  And when cause exists, conversion or

16   dismissal is mandatory unless you can satisfy the requirement

17   of 1112(b)(2).

18          MR. GREENWALD:  Of excuse --

19          THE COURT:  So --

20          MR. GREENWALD:  -- and that's been cured.  And there

21   has been cure.  We have brought forward the missing operating

22   reports or the late operating --

23          THE COURT:  So what's the excuse --

24          MR. GREENWALD:  We are now current.

25          THE COURT:  What's the excuse?

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1        MR. GREENWALD:  I can only say it was a learning

2    curve, Your Honor.

3        THE COURT:  That's the -- I reject that as an excuse.

4    This is a person who's been in this court, involved with this

5    process for, as Mr. Curtin points out, the better part of this

6    year.  And he's got an accountant.

7        MR. GREENWALD:  Your Honor, also, one of the

8    problems --

9        THE COURT:  I don't find that to be an excuse.

10       MR. GREENWALD:  Okay.  Also, one of --

11       THE COURT:  If you want to put Mr. Fischman on the --

12   if you want -- I think what has happened here -- what is

13   happening here is that a -- a case has been made by the U.S.

14   trustee that is certainly a prima facie case.  He has shown

15   that there is cause as defined by the statute to convert or

16   dismiss this case.  So now the burden lies with the debtor to

17   establish if the debtor chooses to try to do so, that one of

18   the exceptions to the -- that some exception to the requirement

19   exists.

20       MR. GREENWALD:  If Your Honor would allow us to have

21   an evidentiary hearing, that would be fine.

22       THE COURT:  Call your first witness.

23       MR. GREENWALD:  If I may just have five minutes with

24   Mr. Fischman before I put him on?

25       THE COURT:  No.

1          MR. GREENWALD:  Okay.  Your Honor, I'll call Mr.

2    Fischman.

3          THE WITNESS:  Your Honor --

4          THE COURT:  Okay.  Mr. Fischman, you need to take the

5    witness stand.

6        (Pause)

7          THE CLERK:  Please raise your right hand?

8        (Witness sworn)

9          THE CLERK:  Would you please state and spell your name

10   for the Court?

11         THE WITNESS:  Michael Fischman.  M-I-C-H-A-E-L,

12   F-I-S-C-H-M-A-N.

13         THE WITNESS:  Okay.  May I begin, Your Honor?

14         MR. GREENWALD:  Mr. Fischman, I have to ask you a

15   question.

16         THE WITNESS:  Okay.

17         THE COURT:  Mr. Fischman, this is a process where you

18   respond to questions that are asked of you and you don't speak

19   unless there's a question pending.  If there's an objection,

20   you do not speak until the objection's been ruled on.

21         THE WITNESS:  Can I make the objection?

22         THE COURT:  I beg your pardon?

23         THE WITNESS:  May I make the objection?

24         THE COURT:  No.  The objection -- you are the witness.

25   An objection will be made by other parties --

1       THE WITNESS:  Okay.

2       THE COURT:  -- if there are any objections to be made.

3  You may begin your inquiry, Mr. Greenwald.

4       MR. GREENWALD:  Thank you, Your Honor.

5  DIRECT EXAMINATION

6  BY MR. GREENWALD:

7  Q.   Mr. Fischman, you've heard that you were late in providing

8  the accounting to -- on Yakaputz.

9  A.   Correct, yes.

10 Q.   All right.  Can you explain the reason why you were late?

11 A.   Totally blocked it out.  This has been an incredibly

12 confusing experience for me.  I, in all good faith, was not

13 even aware that this had a timeline on it.  So it was only when

14 I was answering the motion that I became aware that I had

15 reneged on answering this as quickly as I should have.  But it

16 was like a total confusing experience for me.  It was not an

17 intentional act.  It was an act of -- just an unwitting act, a

18 total block-out.  This has been an incredibly anxiety producing

19 experience for me.  I am taking medication in order to sleep.

20 I can't sleep.  You know, this is my life's work here.  And I

21 have family at stake and I have a wife at stake.  And, you

22 know, this was just like a total loss of consciousness --

23 Q.   Mr. Fischman --

24 A.   -- on my part.  Yeah?

25 Q.   All right.  Have there been any -- have there been other,

1   for lack of a better term, distractions in your family?

2   A.   Well, you know, my daughter --

3        (Pause)

4   A.   I have trouble talking.

5        THE WITNESS:  Can I take a moment to --

6        THE COURT:  Yes.

7        THE WITNESS:  -- to recover?

8        THE COURT:  Do you want to provide Mr. Fischman --

9        THE WITNESS:  Could I go to the restroom?

10       THE COURT:  -- with a glass of water?

11       MR. GREENWALD:  Okay.  Thank you.

12       (Pause)

13       MR. GREENWALD:  Thank you for this intermission, Your

14  Honor.

15       THE WITNESS:  Thanks.  Thanks.  I don't know if it's

16  going to help too much.

17  A.   Talking about my daughter might be too emotional for me.

18  So if we could deal with some other questions?

19  Q.   All right.  On the monthly operating reports --

20  A.   Yes.

21  Q.   -- that were filed late --

22  A.   Yes.

23  Q.   All right?  Can you explain why they were filed late?

24  A.   You know, we did everything in our power -- I've had two

25  people assisting me as bookkeepers for quite a while.  This is

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1    not a new -- this is not a new event.  The first bookkeeper was

2    hired as soon as we filed -- as soon as we filed.  We had

3    trouble with the previous bookkeeper.  She was doing everything

4    wrong.  And that's actually where that 900 dollar check went in

5    order to make corrections of the MORs that she was submitting.

6    So I've been working with a bookkeeper.  I've been trying very

7    hard to get these things in time.  It's been an extremely

8    tedious process because there's so many different things to

9    record.

10         So we've tried very hard.  And usually we get everything

11   to my accountant in time but sometimes there's a delay.

12   Actually, it comes from the final product, putting it together.

13   Q.   The first operating report -- was the accountant retained

14   yet?

15   A.   I don't recall.

16   Q.   All right.

17   A.   I don't --

18         MR. GREENWALD:  Your Honor, I think the record will

19   reflect that Mr. Korcarz was not yet retained at that time.

20         MR. CURTIN:  Objection, Your Honor.  Mr. Greenwald's

21   testifying.

22         THE COURT:  Whose fault is that?  It wouldn't be -- I

23   mean, that's not -- I don't think the fact that you haven't

24   retained your accountant is an excuse for not filing an

25   operating report on time.

1        MR. GREENWALD:  However, Your Honor, in an effort to

2   manage correctly, he did retain an accountant and replaced

3   bookkeepers so things would be done on time correctly.

4   Q.   And, Mr. Fischman, was the --

5   A.   If I could just add to that, one of the reasons they were

6   not done on time is 'cause I was not in the routine.  You know,

7   we went from reporting one entity to suddenly reporting ten or

8   eleven different entities.  This was like a very different

9   procedure.  It was very hard to get that -- I mean --

10  Q.   Have you succeeded in getting them in on time?

11  A.   Yes.  They're coming in not time.  We're getting the

12  process.  You know, it's a --

13  Q.   The last operating report was for September.  Was that in

14  on time?

15  A.   Yes, it was.

16  Q.   The operating report for August --

17  A.   I believe that was three days late.

18  Q.   Okay.  And the operating report for July?

19  A.   I'm not -- I think it was about six days late or seven

20  days late.  But again, it's --

21  Q.   Well, but for --

22  A.   -- getting into the swing of it.  It's --

23  Q.   Right.  The operating report for --

24  A.   It's like a business.  It's like a --

25  Q.   The operating report for October, when do you anticipate

1    that being filed?

2    A.    We could probably have that filed the latest by the 15th.

3    Q.    So you expect to be able to file that before the deadline?

4    A.    Yes.  We have a new procedure.  What we do is we tally up

5    every week.  What we were doing before is we were waiting till

6    the end of the month for a tally.  So now what we do is we do

7    it every week so at the end of the month it's all there.  And

8    we just have to wait for the bank statements.

9    Q.    Okay.  There was discretion --

10          MR. GREENWALD:  Excuse me, Your Honor.  It looked like

11   Your Honor was about to ask a question.

12          THE COURT:  No.

13   Q.    In the response, there's discussion about payments that

14   were made to either Albany Commons by tenants or to Yakaputz by

15   tenants.

16   A.    Yes.

17   Q.    Can you describe what was done to those and why that

18   happened?

19   A.    Well, we have a credit card vending machine and some of

20   the tenants pay through the credit card.  So that card is -- we

21   only have that through Albany Commons.  So some of the rents go

22   directly to Albany Commons.  Some of the people in Albany,

23   because the billing is on Albany Commons' stationery,

24   automatically make their checks to Albany Commons even though

25   it says on the invoice make it out to 572 or whatever the

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1    entity is, they still automatically make it out.  So when we

2    get the checks, we put it into Albany Commons.

3    Q.   Right.

4    A.   And then the money is paid back to the entity unless, as

5    it is, there's been substantial construction that's been going

6    on on Prevention I's property.  And the funds for that have

7    been left in Albany Commons to disburse all the payments of

8    Home Depo and salaries and so, mainly for construction costs.

9    Q.   For the billing practices, have you changed the way

10   tenants receive bills?

11   A.   Yes.

12   Q.   Can you describe how it works now?

13   A.   Well, the tenants in the Brooklyn properties receive an

14   invoice that basically has my name on it and make checks out to

15   Michael Fischman.  When we were billing for Yakaputz before the

16   receiver was in, we were billing under Yakaputz stationery.

17   And now that we found out that Carriage House Development is

18   still alive -- I didn't realize the corporation was still

19   alive.  That's why we didn't file reports for it.  We're using

20   that stationery again for billing in Brooklyn.  So we're using

21   that as a management company again.  We were originally billing

22   everybody through Carriage House Development.  All the billing

23   to all the buildings in Albany and New York that was just being

24   used as a billing company, that has stopped.  Now it's being

25   billed separately through Albany Commons for the Albany

1  properties and through either Fischman directly or through

2  Carriage House now that they've been reinstated for billing.

3  So --

4  Q.   There was reference made to - I mean where you acknowledge

5  that there was a payment for -- there's Club Penguin and also

6  for theater tickets which had not been reimbursed.

7  A.   That's correct.

8  Q.   Is it your intention to reimburse?

9  A.   Yes.

10       MR. CURTIN:  Objection, Your Honor.  If I may -- and I

11  apologize in advance for the speaking objection.  But my

12  understanding was that the Court had pointed out that we had

13  proven our case regarding 1112(b)(4)(E) and that now the burden

14  had shifted to the debtor to show that the case should not be

15  converted or dismissed under (b)(2).  And now we're moving on

16  to the gross mismanagement grounds which I don't believe, at

17  this point, are relevant.  If there's cause under subsection

18  1112(b)(4)(E) then really the only issue is whether the debtor

19  can satisfy its burden under 1112(b)(2) which these questions

20  have nothing to do with.

21       THE COURT:  I'm going to permit Mr. Greenwald to allow

22  his testimony -- to introduce testimony about all of the

23  grounds for conversion or dismissal that were put on the record

24  when you -- during your presentation.

25       MR. CURTIN:  Thank you, Your Honor.

1          THE COURT:  Go ahead.

2          MR. GREENWALD:  Thank you very much, Your Honor.

3          THE COURT:  Go ahead, please.

4    Q.   If you would answer the question?

5    A.   I'm sorry.  Could you reframe it?

6    Q.   The question was the amount for the theater tickets and

7    for Club Penguin, is it your intention to pay that back?

8    A.   Yes.

9    Q.   And when do you intend to pay that back?

10   A.   I'll pay it back at any point.  But it was -- basically,

11   the Penguin was for my daughter, something for the computer.

12   And actually, the tickets were for a birthday.  We went to the

13   theater.

14   Q.   Okay.  But do you intend --

15   A.   I used Albany Commons 'cause we don't have a credit card.

16   Q.   All right.  Now do you account for all of the expenses for

17   which the debit card is used?

18   A.   Yes, absolutely

19   Q.   All right.

20   A.   I account for them.

21   Q.   And do you pay them back?

22   A.   Yes.  Yes, we do.

23   Q.   And do the entities pay them back?

24   A.   Yes.

25   Q.   And they're recorded?

Page 32

1   A.   Everything is recorded.

2   Q.   And are there -- is it possible to tell what entity has

3   used the credit card and paid it back?

4   A.   Yes.  Yes, it is possible.

5   Q.   And why is it that Albany Commons had a debit card?

6   A.   Because it's not a DIP account which, as the Court knows,

7   with a DIP account you can't get a debit card.  So Albany

8   Commons is not a DIP account.

9   Q.   Do you have a credit card?

10  A.   I have a debit card.

11  Q.   Right.  But do you individually have a credit card?

12  A.   No.

13  Q.   So would you be able to make any purchases for which a

14  debit or a credit card or other form of plastic device would be

15  used?

16  A.   No.

17  Q.   All right.  Have you ever tried to make purchases for

18  yourself using a check?

19  A.   That can be done if you're paying a bill but not if you're

20  buying construction supplies or theater tickets, for example,

21  or chalking a child's --

22  Q.   And the debit card is used for construction supplies?

23  A.   Primarily.

24  Q.   All right.  And for what other purposes is it used?

25  A.   Paying -- it's been used for fuel costs.  Sometimes the

1    charge for fuel -- everything's related to the real estate.

2    Q.    Okay.  To --

3    A.    Occasionally -- I have occasionally used it for personal

4    charges but then we pay it back.

5    Q.    Okay.

6    A.    Then we pay it -- it's when there's no cash available.  I

7    have no option --

8    Q.    Do you anticipate that there will ever be another occasion

9    where the electricity bill will not be paid on your home?

10   A.    No.

11   Q.    And what have you done to make sure that that doesn't

12   arise?

13   A.    Well, we're staying current with our electric bill.

14   Q.    So you're current on --

15   A.    Yes.

16   Q.    -- electricity bills?  What would have happened if you

17   didn't do what you did with, for lack of a better term,

18   borrowing the money from Yakaputz?

19   A.    Well, our office would have shut down because the

20   administrative offices is adjoined to my home in Westchester.

21   I would not have been able to see patients there.  I see

22   patients there also.  My kids would have come home from school

23   and they would have had no electricity.

24   Q.    All right.  But in any event --

25   A.    We had no other avenue for getting money to get the

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

Page 34

1   electric back on within a reasonable period of time.

2   Q.   So you've taken steps so this will never happen again?

3   A.   Yes.

4   Q.   Tranquility Spa.  Could you describe how that came about?

5   A.   Well, I hurt myself.

6   Q.   What did you do?

7   A.   I was lifting some stuff over at 508 and I hurt my

8   shoulder.  And, I mean, I must admit, I don't have a great

9   shoulder to begin with.  But this is -- I went for a medical

10  massage --

11  Q.   Okay.

12  A.   -- and I charged it as a business expense --

13  Q.   Okay.

14  A.   -- against Albany Commons.

15  Q.   Because that happened --

16  A.   That happened --

17  Q.   -- in connection with the work that was being done.

18  A.   -- on construction site, yeah.  Despite the fact that I

19  had a bad shoulder to begin with but it got irritated from

20  that.  So I used it as a business expense.

21  Q.   Okay.  What have you been able to do in connection with

22  the reorganization process?

23  A.   Well -- thanks.  I appreciate it.  Well, you mean, in

24  terms of depending --

25  Q.   Do you have any possibility of selling of assets?

1   A.   Yes.  Yes.  We have a contract for sale for one of the

2   properties in Albany.  We have a signed contract for sale of

3   the Brooklyn property, 886.  We have a low offer on 154.

4        THE COURT:  You have a what?

5        THE WITNESS:  A low offer.  The offer is very low.

6   We've countered with a --

7   Q.   There's a bid for 154?

8   A.   Specifically, it was a two million offer and we're

9   countering -- it's being offered at 2.9.  So that was low and

10  we countered with 2.75.  So that's pending.  We also have a

11  partnership in an ongoing -- for Yakaputz --

12  Q.   For Yakaputz?

13  A.   -- where fifty percent of the shares of Yakaputz are being

14  sold.

15  Q.   Could you describe that?

16  A.   It's a 260 something thousand dollar buy-in for fifty

17  percent of Yakaputz.  Those monies would be used to satisfy the

18  arrears to Fannie Mae and reinstate the existing mortgage.  And

19  we would then operate with that mortgage with the fifty percent

20  partnership in the corporation that owns it.

21  Q.   Is there a term sheet for that?

22  A.   Yes.

23  Q.   All right.  And what do you see as the next step?  What do

24  you see as the next step in that process?

25  A.   Well, to get approval by the Court.  And once the Court

1    approves that, we'll approach Fannie Mae.  And hopefully,

2    that'll be an easy transition and we'll be able to reinstate

3    Yakaputz without a Chapter 11.

4    Q.    Okay.  With respect to Prevention I, is there a proposed

5    sale on that property?

6    A.    There's a proposed -- there's a contract for 695,000.

7    Q.    And -- but you were still waiting for the paper on that.

8    But there is a contract out there being circulated, is that

9    right?

10   A.    Yes.  You're in touch -- you're in contact with the

11   attorney.

12        MR. GREENWALD:  Your Honor, I can represent that I was

13   in contact with the broker and I have contacted the buyer's

14   counsel but I am waiting to hear back from them.  I have been

15   sent a copy of the proposed contract.

16   Q.    On 304, can you describe your efforts to reorganize there?

17   A.    Yes.  What we're hoping to do is reinstate the mortgage,

18   the first mortgage, through Haven Capital.  We're in a position

19   to pay the arrears on that.  However, we have not gotten

20   cooperation from --

21   Q.    What have we been waiting for?

22   A.    We're waiting for the amount that's owed.

23   Q.    Have we asked for it?

24   A.    We've been asking for it for about a month and a half or

25   longer, I think.

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1   Q.   Okay.  Do you have the -- how do you intend to reinstate

2   that mortgage?

3   A.   We would have the cash.  My wife has a very good friend

4   that will put up the cash and become a part owner of the

5   property or give us the mortgage on the property.

6   Q.   Could you describe the pending deal with 886?

7   A.   886, we have a signed contract to do a short sale.

8   Q.   Are the buyers taking any action to pursue that?

9   A.   They're currently negotiating with the bank.

10  Q.   Okay.

11       MR. GREENWALD:  And, Your Honor, I would represent

12  that we would be making a motion for authority to sell upon

13  hearing from the buyers that they have achieved an accord with

14  the bank.  Until then, it may be premature to make that motion

15  but we make it nonetheless.

16       THE COURT:  Well, if the bank won't accept less than

17  it's owed then it's pointless.

18       MR. GREENWALD:  Except that -- except that the bank

19  after seeing the motion to approve the sale may decide that it

20  will buy it in and therefore own it as opposed -- or it may

21  decide that, you know what, I'll take the money.  However, at

22  this point, the bank has not been active with respect to that

23  property.  So this way, we're taking action so that something

24  can be done with that property.

25       THE WITNESS:  May I say something?

 1              MR. GREENWALD:  Yes.

 2              THE WITNESS:  I would just like to say something to

 3    the Court that --

 4              MR. CURTIN:  Objection, Your Honor.

 5              THE COURT:  Okay.  Mr. Fischman, your role is to --

 6              THE WITNESS:  Answer questions.

 7              THE COURT:  -- respond to questions that are put to

 8    you.

 9              THE WITNESS:  Okay.

10    BY MR. GREENWALD:

11    Q.   Mr. Fischman, are you responding to or are you adding to a

12    question that I previously asked you?

13    A.   I'm adding to all the questions --

14              MR. CURTIN:  Objection, Your Honor.

15              THE COURT:  Sustained.

16              MR. GREENWALD:  I was just going to ask which

17    question.

18              THE WITNESS:  Okay.

19    Q.   There's been work in improving the building, is that

20    correct?

21    A.   That is correct.  The 508 -- we are currently completing a

22    fifth apartment which will increase the cash flow approximately

23    1250 a month.  Puts the building at a substantially cash

24    positive -- positive cash flow.

25    Q.   How much time do you think you need to be able to finalize

1   these agreements that you've described?

2   A.   I would like sixty days to revisit it.  Hopefully be

3   completed in sixty days so I could revisit it at that point.

4   Hopefully, it'll be accomplished by then.

5   Q.   Within that sixty day period, do you anticipate being able

6   to make a motion to the Court for approval of these

7   transactions?

8   A.   Yes, I do.

9        (Pause)

10  Q.   The one thousand dollars that you used for an appraiser,

11  why did you do that?

12  A.   I did it because I thought that's what we were doing.  We

13  were -- Haven had made a comment that the property that's owned

14  by 304 Washington was valued at approximately what they say we

15  owe them.  We were talking, you and I, counsel and I, that we

16  should do an appraisal on the property to show them what the

17  actual value was.  I was not aware that I needed to get

18  authorization from the Court.

19  Q.   And what happened when you found out that -- or what

20  happened when I found out that you did an appraisal?

21  A.   I don't think I should use those words here but you got

22  pretty pissed off.

23  Q.   Did I --

24  A.   What?

25  Q.   Did I know you were getting an appraisal?

1    A.    No.  No.  I thought you did but apparently, after it was

2    done, you said, well, you know, that had to get approved first.

3    Again, I am not a professional at doing this.  I --

4    Q.    And when I --

5    A.    So --

6    Q.    When I found out, did I tell you that you cannot hire any

7    professionals without court order?

8    A.    Yes, you did.

9    Q.    Do you expect to be hiring anybody other than maybe

10   construction workers which, in the ordinary course of

11   business -- do you anticipate hiring anybody except for maybe

12   construction workers to do the work on the premises in the

13   ordinary course without a court order?

14   A.    No.  No, not aside from construction workers.  We are

15   trying to get the approval of a mortgage banker to negotiate.

16   We still haven't gotten that approval.

17   Q.    You've heard Mr. Curtin refer to various payments that

18   came out of Albany Commons or Yakaputz --

19   A.    I'm sorry.

20   Q.    Thank you.  You've heard Mr. Curtin refer to various

21   payments that he considered commingling with respect to Albany

22   Commons or Yakaputz and the various entities.

23   A.    Yes.

24   Q.    Can you describe what those payments were for and how the

25   accounting was done for them?

1    A.    I'm sorry.  I can't unless we're specific --

2    Q.    Okay.

3    A.    -- to --

4    Q.    Albany Commons --

5    A.    Yes.

6    Q.    -- made payments on account of construction work, correct?

7    A.    Yes.

8    Q.    All right.  Was it paid for that work?

9    A.    Yes.

10   Q.    The work was done for who?

11   A.    Well, at one period of time, there was work done on 304.

12   We renovated an apartment there, apartment number 5.  I

13   provided pictures for the Court.

14   Q.    Pictures are included within the opposition, is that

15   correct?

16   A.    Yes.  Yes.  And we also -- there were times when we used

17   Albany Commons to pay for construction supplies for Yakaputz

18   for Apartment number 7 because we couldn't charge it any other

19   way.  So that was actually before I had -- I think it was

20   before I had -- I'm not sure if that was before I had a debit

21   card -- the Yakaputz.  Yakaputz only recently got those debit

22   cards.  So --

23   Q.    Were payments --

24   A.    Yeah.  It was paid back.

25   Q.    It was paid back.  For the other properties other than --

1    A.    Well, 508, it's been quite a big expense because --

2    Q.    Well, 508 is Prevention I, correct?

3    A.    -- they over-budget -- what?

4    Q.    501 (sic) is Prevention I?

5    A.    508.

6    Q.    508 is Prevention I, is that right?

7    A.    Yeah.  Yeah.  I mean, we're just about finishing up now.

8    I'm actually going to be up there tomorrow to meet with the

9    purchaser because he wants to go over some stuff with me.  But

10   we're finishing that one up now.  That one went pretty over-

11   budget.  But I charged through Albany Commons.  No other way to

12   pay for Home Depo.

13   Q.    Is there a way for you to, in the future, avoid using --

14   you individually, to avoid using the debit card, Albany

15   Commons' debit card?

16   A.    You mean, for personal expenses?

17   Q.    For personal expenses.

18   A.    Only if I use cash.  And sometimes when we run out of

19   cash, we use a credit card -- a debit card.  So -- I mean, once

20   we're out of the bankruptcy.

21   Q.    When you use -- do you ever make purchases with cash?

22   A.    Yes.

23   Q.    Do you account for them in your operating reports?

24   A.    Yeah.  Yeah.  I always get receipts.  But primarily, like

25   when we go to the supermarket, I have to use cash.  It's often

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

Page 43

1    for personal expenses as I can because I don't want it to keep

2    being a problem on the MORs.  So we do use cash.  But we bring

3    the receipts back and those were accounted for at the end of

4    the month.

5         Pause

6    Q.   There was not provided rent-rolls in certain operating

7    reports.  Do you now provide rent-rolls in your operating

8    reports?

9    A.   We do.

10   Q.   Do you anticipate continuing to provide rent-rolls in your

11   operating reports?

12   A.   Of course I do.  Absolutely.

13   Q.   To the extent that there were deficiencies that are

14   referred in the motion -- you read the motion, correct?

15   A.   Yes.

16   Q.   The deficiencies that are referred to in the motion, what

17   have you done to address them?

18   A.   Which deficiencies are you referring to?

19   Q.   In terms of operating reports.

20   A.   I'm still not clear on the question.

21   Q.   Okay.  All right.  Where something would be missing.

22   We've already discussed the rent-roll.  If there's a

23   discrepancy, will you footnote or have Mr. Korcarz footnote the

24   discrepancy and the reason therefor.

25        MR. CURTIN:  Objection, Your Honor.  It's more of a

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

Page 44

1    leading question than the other leading questions have been.

2    He just answered his own question from the last question.

3            MR. GREENWALD:  Okay.  Sorry, Your Honor.

4            THE WITNESS:  Sorry.  I don't understand the question.

5    I didn't understand the question.

6    Q.    If there are discrepancies --

7    A.    When you say discrepancies, could you give me an example?

8    Q.    Let's say if the rent-roll is --

9    A.    Oh.  In other words, if --

10   Q.    -- one amount and the rents are another amount --

11   A.    Right.  We --

12   Q.    -- what will you do?

13   A.    As to that, absolutely.  We account for that.  We would

14   account for it.  Usually, that's when rent is paid to Albany

15   Commons and not directly to the entity.  We then are in a

16   position to pay back that entity which we do, if that's what

17   you mean by discrepancy.  Okay.

18   Q.    Thank you.  Can you tell me the role of Mr. Korcarz in the

19   reorganization process?

20   A.    In reorganization process?  Well, I could tell you what

21   his role is in terms of --

22   Q.    In this case.

23   A.    -- our preparing the MORs --

24   Q.    Okay, if you would.

25   A.    That he's extremely active and absolutely fantastic in his

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

Page 45

1    perseverance of staying with this and making sure everything's

2    done exactly the way it should be done.  We -- he works

3    directly with the bookkeepers in my office when they have any

4    questions as does your legal assistant.  She works with us as

5    well when we have any questions.  You know, we're trying to

6    fine tune this.  So Hal is incredible with that.  I mean, he's

7    put in a lot of time and energy to make sure those reports are

8    in on time.  Sometimes I get a ride there early in the morning

9    on Sunday and get them to make sure they're typed in time to

10   get in so that the Court gets them.

11   Q.    Did you ever ask permission to have a meeting with the

12   Office of the United States Trustee?

13   A.    I did.

14   Q.    And what was the purpose of that meeting?

15   A.    The purpose of that meeting was so we would have a very

16   clear idea of what the trustees were looking for with the MORs

17   to make sure that we give it to you exactly the way you want

18   it.  That was primarily -- really, make sure we give you

19   exactly what you want.

20   Q.    And were you granted that meeting?

21   A.    No, I was not.

22         MR. GREENWALD:  Your Honor, I have no further

23   questions.

24   CROSS-EXAMINATION

25   BY MR. CURTIN:

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1    Q.    Mr. Fischman, you are Michael Fischman, the principal of

2    the individual case here, is that correct?

3    A.    That is correct.

4    Q.    You're also the principal of Prevention I and the

5    principal of 304 Washington Avenue?

6    A.    That is also correct.

7    Q.    And Prevention I was filed on October 15th of 2009

8    approximately?

9    A.    The --

10   Q.    The bankruptcy case of Prevention I?

11   A.    -- petition?

12   Q.    -- was filed in October of 2009?

13   A.    You talking about the petition?

14   Q.    Yes.

15   A.    Yes, as far as I know.

16   Q.    And the petition in 304 Washington was filed in December

17   of 2009?

18   A.    To the best of my knowledge.

19   Q.    And your individual case was filed in May of 2010.

20   A.    That is for sure.

21   Q.    And at all times between October of 2009 and now, you've

22   been involved in all three -- in all three of these bankruptcy

23   cases as long as they've existed, correct?

24   A.    I'm sorry.  I didn't hear your question.

25   Q.    Have you been involved in bankruptcy cases before this

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1   Court since October of 2009 personally?

2   A.   No, I have not, not personal bankruptcy.

3   Q.   You haven't?  I used the -- have you been involved either

4   in your personal capacity or in your capacity as a principal of

5   a corporate debtor, have you been involved in bankruptcy cases

6   since October 2009?

7   A.   Since?

8   Q.   Since October 2009, yes, sir.

9   A.   I don't believe so.

10   Q.   You were not --

11   A.   I'm not sure -- I'm not sure I understand --

12   Q.   Were you the principal of Prevention I in October 2009

13   when it filed for bankruptcy?

14   A.   Again, I'm having a little trouble hearing.  I'm sorry.

15   Q.   Were you the principal of Prevention I, one of the debtors

16   that we're talking about --

17   A.   Yes.

18   Q.   -- in October of 2009?

19   A.   Yes.

20   Q.   And are you the principal of Prevention I now?

21   A.   Yes, I am.

22   Q.   Were you the principal of 304 Washington in December of

23   2009?

24   A.   Yes.

25   Q.   Are you the principal of 304 Washington now?

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

Page 48

1    A.    Yes, I am.

2    Q.    I want to talk about the orders of the Court that we've

3    been discussing.  You testified that you didn't realize that

4    Carriage House had to file a controlled entity report, is that

5    correct?

6    A.    That's correct.

7    Q.    Did you read the Court's July 2nd order that required

8    specifically that a report be filed for Carriage House?

9    A.    One more time.  I'm --

10   Q.    Did you read the Court's order dated July 2nd that

11   required a controlled entity report for Carriage House?

12   A.    If I did, you know, it just went completely --

13             MR. CURTIN:  For the record, Mr. Fischman has taken

14   his hand and put it over his head.

15   A.    Meaning, it went over my head.  Quite honestly, Mr.

16   Curtin, many of these legal documents are very new to me.

17   Q.    I didn't hear you.

18   A.    Are very new to me in terms of reading them and studying

19   them and so forth.  So I have been accustomed to relying on

20   counsel to take care of things for me.  I'm learning a whole

21   different way of doing things since I'm working with my current

22   attorney.

23   Q.    You testified on direct that you recently became aware

24   that Carriage House was still in existence, is that correct?

25             MR. GREENWALD:  Objection.  Mischaracterizes his

1    testimony.

2              MR. CURTIN:  Actually, that's exactly what he said.

3              MR. GREENWALD:  He said -- he said the existence not

4    in business.

5              THE COURT:  I think that's what Mr. Curtin just said.

6              MR. GREENWALD:  But he said exist -- forgive me.  Then

7    I misheard.  Your Honor, objection withdrawn.  I'm sorry.

8    Q.    So that was, yes, that is what you testified to?

9    A.    Please ask me the question again.

10   Q.    On direct examination, did you testify that you just

11   recently became aware that Carriage House was in existence.

12   A.    I became aware that the corporation was still active.

13   Q.    Okay.  You appeared before the Office of the United States

14   Trustee and me specifically at a 341 meeting of creditors,

15   isn't that accurate?

16   A.    I did.

17   Q.    Okay.  And didn't we talk about Carriage House at that

18   point?

19   A.    We did.

20   Q.    And didn't you tell me that it was an active corporation

21   at that point?

22   A.    No.  I said that we were using it for billing purposes but

23   I was not aware that it was still active.  It's a Connecticut-

24   based corporation.

25   Q.    Okay.  And when we discussed reporting requirements,

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

Page 50

1    didn't I tell you that all of your entities would be required

2    to file those reports?

3    A.    You did.

4    Q.    Thank you.

5    A.    You absolutely did.  And that went completely over my

6    head.

7    Q.    Let's talk about -- you mentioned -- I have a couple of

8    specific questions regarding the appraiser that's been

9    discussed.  At a certain point in time, did you hire an

10   appraiser?

11   A.    Yes, I did.

12   Q.    And did you pay that appraiser?

13   A.    Yes, I did.

14   Q.    Did you seek Court approval to hire that appraiser?

15   A.    I did not.

16   Q.    Did you seek Court approval to pay that appraiser?

17   A.    I did not.

18   Q.    On direct, you testified that you used the Albany Commons

19   debit card for the Yakaputz construction expenses, is that

20   correct?

21   A.    That's correct.

22   Q.    You also testified that the reason that you were using a

23   debit card was because you couldn't get a debit card for the

24   debtor-in-possession account, is that correct?

25   A.    It's not that I couldn't get it.  I don't believe I had it

1    yet.

2    Q.    Okay.

3    A.    I don't believe I had had it yet.

4    Q.    Is Yakaputz a debtor?

5    A.    No.  Uhh --

6    Q.    Isn't it correct that Yakaputz is not a debtor?

7         MR. GREENWALD:  Your Honor, we'll concede it's not a

8    debtor.

9    Q.    So if --

10        THE WITNESS:  I don't know the answer to that.

11   Q.    Let me --

12        MR. CURTIN:  I'll withdraw the question.

13   Q.    Has Yakaputz filed a bankruptcy petition?

14   A.    No.

15   Q.    So couldn't Yakaputz have obtained a debit card if it

16   wished?

17   A.    Yes.  Yes.  And it did.

18   Q.    Okay.  But again, your testimony was that you paid for

19   expenses for Yakaputz out of Albany Commons.

20   A.    When there was no debit card for Yakaputz at that point.

21   Q.    Let's talk about your progress in the case so far.  And

22   I'll limit myself to your individual case.  Have you proposed a

23   plan that can be confirmed in your individual case?

24   A.    Yes.

25   Q.    You have fi -- have you filed a plan before this Court, a

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

Page 52

1    plan of reorganization?

2    A.    We initially filed a plan of reorganization.

3    Q.    Okay.  Have you sought a hearing on confirmation of a

4    plan?

5    A.    I'm sorry?

6    Q.    Have you sought a hearing on confirmation of a plan?

7    A.    Not to the best of my knowledge.

8    Q.    Have you -- there was a fair amount of discussion of sale

9    of properties.  Have you filed any motions to sell any

10   properties in either -- any of these three cases?

11   A.    Not as of yet.  I don't believe we have, have we?

12   Q.    Thank you.  When you received notice of the motions that

13   were filed against you by our office in these cases, you didn't

14   file any motions to sell anything then, is that correct?

15   A.    That's correct.

16   Q.    Now, with regard to Prevention I and 304 -- let me start

17   with 304 Washington.  Isn't it a fact that Haven Capital has a

18   foreclosure sale scheduled for early December for the property,

19   the 304 Washington property?

20   A.    I'm not aware of that.  I haven't heard anything of that.

21   Q.    And isn't it a fact that the stay has been lifted as

22   against 304 Washington and they're free to proceed with that

23   foreclosure if they wish?

24   A.    As far as I know, the stay was only lifted on my receiving

25   rents.  I was not aware that the stay was lifted for them to

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

Page 53

1    proceed with foreclosure.

2    Q.   Now, when your counsel asked you if there was any way that

3    you could not use a debit card, you stated no, is that correct?

4         (Pause)

5    A.   I don't believe I said no.  I said it's difficult to --

6    there are times when it's very difficult to --

7         THE COURT:  I cannot hear what you're saying.

8    A.   I believe what I said a few moments ago was that it would

9    be very difficult not to use a debit card since we don't have

10   any debit cards that are attached to our personal account.

11   Thank you.  Sorry about that.

12        MR. CURTIN:  Just one moment, Your Honor.

13        (Pause)

14   Q.   Lastly, Mr. Fischman, going back to the personal expenses

15   that were paid out of Albany Commons and I'm only going to

16   focus on two, the theater tickets and the Club Penguin expense.

17   You did not pay those back immediately after they were

18   incurred, is that correct?

19   A.   That's correct.

20   Q.   You did not pay them back after you received my motion

21   approximately a month ago, isn't that correct?

22   A.   That is also correct.

23   Q.   And, in fact, you haven't paid them back even as we sit

24   here today, is that correct?

25   A.   That's also correct.

1          MR. CURTIN:  Thank you, Your Honor.

2          THE COURT:  Okay.  Is there anything else you want to

3     put on the record, Mr. -- you want to ask him any other

4     questions, Mr. Greenwald?

5          THE COURT:  Yes, Your Honor, just a few questions.

6          THE WITNESS:  May I revisit that last question, Mr.

7     Curtin?  Can I revisit that last question?  If those two items

8     were paid back?  I --

9          MR. CURTIN:  No.  I don't actually believe you can

10    unless the Court grants you leave to do so.  I've completed my

11    questions.

12         THE COURT:  I'll allow you to complete your answer to

13    that question.

14         THE WITNESS:  May I?

15         THE COURT:  Go ahead.

16         MR. GREENWALD:  The Court says you may.

17         THE WITNESS:  I must -- I have to admit to the Court,

18    I have a little bit of an ADD.  It is quite possible we have

19    paid that back.  I would have to look and see but it is

20    possible we did pay that back.

21         THE COURT:  But you're not telling me that you have

22    paid it back?

23         THE WITNESS:  Right.  I would have to look it up to

24    see if we paid it back.  It was a thirty dollar charge and 179

25    dollar charge total.

1    REDIRECT EXAMINATION

2    BY MR. GREENWALD:

3    Q.    Mr. Fischman, you indicated that the order directing the

4    filing of the belated entity reports and the accounting went

5    over your head, is that what you -- that's what you said,

6    right?

7    A.    Yes.

8    Q.    Have you since realized the importance of paying attention

9    to orders?

10   A.    Have I since realized --

11   Q.    Have you realized the importance of paying attention to

12   orders?

13   A.    To orders?

14   Q.    To orders.  Written orders --

15   A.    Absolutely.

16   Q.    -- of the Court.

17   A.    Absolutely, yes.  Court orders --

18   Q.    Right.

19   A.    Yes.

20   Q.    When you receive a written order of the Court, what do you

21   intend to do?

22   A.    Read it very carefully and make sure I understand it and

23   take care of it.  I have to satisfy it.

24   Q.    If you don't understand it, what will you do?

25   A.    I will contact you.  I'm going to ask you anyway.  But

1   would need to ask you.

2   Q.   And assuming that I give you at least what will be my

3   understanding of the order, what will you do as a result of

4   that?

5   A.   I will comply.

6   Q.   Thank you.  Carriage House.  When Mr. Curtin asked you

7   about the 341 meeting and your statement about Carriage House,

8   am I correct in understanding that you said that you did not

9   believe it was active.  Is that what your statement was?

10  A.   That's correct.  I didn't believe it was an active

11  corporation.

12  Q.   So what would that mean to you?

13  A.   I was not aware I had to do any kind of filing for it,

14  reporting for it.  It was just being used as a --

15  Q.   What is your understanding of "active" as opposed to

16  "inactive" corporation?

17  A.   Well, something that's doing something, an entity that's

18  doing something, where there's -- receiving cash.

19  Q.   Does it mean that it's in existence?

20  A.   -- and making disbursements.  That's --

21  Q.   Does it mean that the corporation is in existence or does

22  it mean that it's doing something?

23           MR. CURTIN:  Objection, Your Honor.  Asked and

24  answered and leading.

25           MR. GREENWALD:  Okay.

1    Q.   Okay.  Mr. Curtin asked you about the sales that you were

2    describing.

3    A.   Yeah.

4    Q.   When did these sales come about?  When did these

5    agreements that were described come about?

6    A.   I would say within the last five weeks, four or five

7    weeks.

8    Q.   The term sheet for Yakaputz, when was that done?

9    A.   Oh.  We did that last week.

10   Q.   Okay.  The Prevention I agreement --

11   A.   This was about four weeks ago.

12   Q.   866.  When did you receive a copy of the proposed

13   contract?

14   A.   Where we both signed it?  About two days ago, three days

15   ago.

16   Q.   So these are all very recent --

17   A.   Yeah.

18   Q.   -- is that right?

19        MR. GREENWALD:  Thank you, Your Honor.

20        THE COURT:  Anything else, Mr. Curtin?

21        MR. CURTIN:  No, Your Honor.

22        THE COURT:  Okay.  You're excused, Mr. Fischman.

23     (Pause)

24        THE COURT:  Okay.  Do you have anything you want to

25   add to the Court, any argument you want to make?

1           MR. CURTIN:  Briefly, Your Honor.  I'm not going to

2    address the cause.  I think I sufficiently addressed that in my

3    initial argument.  I will address 1112(b)(2).  There's two

4    requirements.  One, the debtor must show that there's a

5    reasonable likelihood that a plan will be confirmed.  And, two,

6    when the grounds for granting such relief include an act or

7    omission, which in this case they do, that there was both a

8    reasonable justification for that act or omission and that said

9    act or omission will be cured within a reasonable period of

10   time fixed by the Court.

11          Your Honor, as Mr. Fischman just testified to, there's

12   no plan.  There's no confirmation pending.  There's no

13   disclosure statement.  And most notably, there's no motions to

14   sell in spite of the fact that these cases have been pending

15   since October and, with regard to the individual case, since

16   May.

17          With regard to the second prong, the justification

18   that has been submitted specifically for the cause of action,

19   the 1112(b)(4)(E) cause of action, is that the orders "went

20   over" Mr. Fischman's head.  I would submit that that is not, by

21   any stretch of the imagination, a reasonable justification.

22   And for that reason, the -- we've established cause.  The

23   debtor's not been able to establish, under 1112(b)(2) that the

24   case should not be converted or dismissed.  Therefore, I would

25   ask the Court to convert the case.

1          MR. GREENWALD:  Thank you, Your Honor.  We've been

2     hearing as gross mismanagement to some degree is bookkeeping

3     which as been described, and which is clear -- basically,

4     transactions have been described.  And the debtor has been able

5     to account for what has gone on.

6          The things where -- or what we have been seeing as

7     items that have not been paid for -- we have a thirty-three

8     payment at Club Penguin --

9          THE COURT:  Why are you taking -- why are individual

10     expenses being paid through the corporate entity account?

11          MR. GREENWALD:  Your Honor, as Mr. Fischman testified,

12     a card was not available to do it.

13          THE COURT:  Why is that?

14          MR. GREENWALD:  And as he also testified --

15          THE COURT:  Why is that?

16          MR. GREENWALD:  Why was a debit card not available?

17          THE COURT:  Right.

18          MR. GREENWALD:  Because, as he testified, he could not

19     get one as a debtor-in-possession.  He could not have a debit

20     card in connection with a debtor-in-possession account.  That

21     was his testimony.

22          THE COURT:  Go ahead.

23          MR. GREENWALD:  So we're talking about two

24     transactions which had not been repaid.  Otherwise, the

25     transactions which were described, there have been appropriate

1    charges made back and forth or contribution or payments made

2    between the entities using the debit card.

3            THE COURT:  Okay.

4            MR. GREENWALD:  So that we are looking at gross

5    mismanagement is amount to two, nonpayment of the thirty-three

6    dollar charge and a 175 dollar charge which the debtor

7    testified he will pay and also he said he might -- might even

8    have paid.  So that does not qualify as -- I don't believe that

9    would qualify as gross mismanagement.

10           Number two.  Yes, Your Honor.  The orders were not

11   complied with on a timely basis but they were complied with

12   ultimately.  And Mr. Fischman gave the reason that he really

13   did not understand and appreciate.  But he's also testified

14   that he will pay attention as far as what has gone on and what

15   has to be done.

16           THE COURT:  All right.  Mr. Greenwald, tell me what

17   basis I would have to conclude that there is a reasonable

18   likelihood that a plan will be confirmed within a reasonable

19   time?

20           MR. GREENWALD:  Very good, Your Honor.  Mr. Fischman

21   has been working on getting the properties to be sold.

22           THE COURT:  Okay.  Well, let's talk.  Let's be

23   specific here.  We have -- this is a case where there is --

24   print me the whole schedule, Tracy, please.  There's 11,000

25   dollars -- or 10,000 dollars -- 11,000 dollars in secured debt

1   and 214,000 dollars in unsecured debt.  Okay.  You've got the

2   Hicks -- I think, if I'm not mistaken, that all of the

3   properties are on Mr. Fischman's individual Schedule A, even

4   the ones that are owned by --

5           MR. GREENWALD:  Even the ones that are owned by the

6   entities.

7           THE COURT:  -- the corporate entities.

8           MR. GREENWALD:  Yes.

9           THE COURT:  So that's a complete -- so you've got the

10  Hicks Street property.  That's not been -- and that is -- your

11  efforts to sell that have been unsuccessful, correct?

12          MR. FISCHMAN:  Yes, Your Honor.

13          THE COURT:  Okay.  I'm asking Mr. Greenwald now --

14          MR. GREENWALD:  Yes, Your Honor.  I was about to turn

15  to the debtor -- yes.  That's been unsuccessful.

16          THE COURT:  Okay.  So you've got a property that --

17  and is that -- that property, is that -- tell me the status of

18  that property.  It's in default, correct?

19          MR. FISCHMAN:  No.

20          THE COURT:  Mortgage is in default?

21          MR. GREENWALD:  That is not in default.  He's actually

22  current in payments on that, Your Honor.

23          THE COURT:  Okay.  So that property is not in default.

24          MR. GREENWALD:  And I believe it's also self-

25  sustaining.  Also, Your Honor --

1          THE COURT:  Okay.  It's self-sustaining.  But why

2     haven't you been able to sell it?  I mean, it's -- according to

3     your schedule, you've got almost two million dollars on equity

4     in that property.

5          MR. GREENWALD:  Your Honor, Mr. Fischman just provided

6     me with a copy of an activity summary report for the efforts to

7     sell it where there has been offers made and counters made.  I

8     will show it to Mr. --

9          THE COURT:  What's the -- I want to go through this.

10    What's the amount of debt that's on that property?

11         MR. GREENWALD:  Two million one, Your Honor.

12         THE COURT:  All right.  And -- but it hasn't been

13    sold?

14         MR. GREENWALD:  Your Honor --

15         THE COURT:  And there's no contract to sell it.

16         MR. GREENWALD:  -- I can report that, according to a

17    report that I'm holding from Hallstead, on October 15 -- let me

18    phrase this.  On October 15th, they lowered the price to two

19    million 799.  Then they got a bid on October 26th for two

20    million.  And they're maintaining that the sale price should be

21    2.7.  So apparently, they're looking for something in between

22    which would carry -- which would cover the mortgage.

23         THE COURT:  That doesn't yield much of anything for --

24    toward anything else.  So Yakaputz property, you have that

25    listed at two million five on your schedule and you say there's

1    a million five on the debt.  That's -- two million five

2    seventy-five is of debt.  195A Washington Park.  Okay.  What's

3    the status of that?  That's in foreclosure, correct?

4            MR. GREENWALD:  Yes, Your Honor.  That's been in

5    foreclosure as we described.  There is a term sheet which has

6    been agreed to which would inject approximately 260,000 dollars

7    into Yakaputz which would have the investor receive a fifty

8    percent interest in Yakaputz and would enable Yakaputz to cure

9    the default on the mortgage --

10           THE COURT:  Okay.

11           MR. GREENWALD:  -- and reinstate the mortgage.

12           THE COURT:  Okay.  You don't have to be in bankruptcy

13   for that.  The stay's already been lifted on that.

14           MR. GREENWALD:  Your Honor --

15           THE COURT:  So the bankruptcy's not helping you with

16   that.

17           MR. GREENWALD:  Your Honor, number one, the debtor had

18   attempted -- had been trying to get the bank to do this for a

19   long time and it had not.  We now do have --

20           THE COURT:  The bank to do what?

21           MR. GREENWALD:  To agree to reinstate upon providing

22   the dollar amount, the dollar to cure.  So we are in a position

23   to be able to cure it.  If the bank is unwilling to

24   reinstate --

25           THE COURT:  Well, Yakaputz isn't in bankruptcy.  You

Page 64

1    could always put them in bankruptcy individually.

2            MR. GREENWALD:  And, Your Honor, if we have to, that

3    is what we'll do.  We're looking to avoid having to do that.

4            THE COURT:  Okay.

5            MR. GREENWALD:  But we do have this -- we do have this

6    deal.

7            THE COURT:  Okay.  There's no reason for Yakaputz --

8    Mr. Fischman's bankruptcy is not adding anything to the

9    Yakaputz situation.

10           MR. GREENWALD:  Correct.

11           THE COURT:  Okay.  886 Madison Street.  That's --

12           MR. GREENWALD:  On 886, there is a contract for the

13   sale of the property which would be subject to a short sale.

14   The buyer's negotiating with the bank which has otherwise been

15   inactive in relation to that property.  That we hope the buyer

16   will have a deal with the bank so it can be sold.  If not, we

17   are contemplating going forward with a 363 sale so that the

18   bank will then decide either it's going to bid in or it is

19   going to --

20           THE COURT:  Again, there is nothing about the

21   bankruptcy that adds anything to this situation --

22           MR. GREENWALD:  On that property.

23           THE COURT:  -- because you cannot sell this property

24   for less than the amount of the secured debt without the

25   lender's permission in bankruptcy.

1          MR. GREENWALD:  Your Honor, I agree with you on that.

2          THE COURT:  Okay.  So that -- the bankruptcy adds

3   nothing to do that.  Or, there is no aspect of a reorganization

4   of Mr. Fischman that is going to emerge from this property.

5          MR. GREENWALD:  Except that it would reduce the amount

6   of debt.  The transaction we contemplate would hopefully reduce

7   the amount of debt or recourse against Mr. Fischman by that

8   lender.

9          THE COURT:  But Mr. Fischman is going to get -- if

10  he -- in a Chapter 7, he's going to get a discharge anyway.

11  It's a short -- you're talking about a short sale.  There's

12  nothing about a short sale -- which, first of all, you can't do

13  without the lender's permission.  So there's no way that you

14  can force them to do that in this bankruptcy.  And it's not

15  going to further the cause of your reorganization in this case.

16          Okay.  Ford Hill Road.  I guess you're not selling

17  that at this point?

18          MR. GREENWALD:  Your Honor, there are efforts to --

19  there are continuing efforts to sell it.  And there's an

20  alternative they're considering:  renting it as well.

21          THE COURT:  Prevention I.

22          MR. GREENWALD:  Forgive me, Your Honor.  I apologize.

23          THE COURT:  Renting -- is the mortgage current on Ford

24  Hill Road?

25          MR. GREENWALD:  Is the mortgage current on that?

1          MR. CURTIN:  No, Your Honor.

2          MR. GREENWALD:  No, it is not.

3          THE COURT:  Okay.  Is the mortgage current on Madison

4     Street?

5          MR. FISCHMAN:  No.

6          MR. GREENWALD:  No.

7          THE COURT:  Is the mortgage current on -- I guess it's

8     not on Yakaputz.

9          MR. GREENWALD:  No.

10          MR. CURTIN:  No.

11          THE COURT:  Prevention I, 508 Madison Street.

12          MR. GREENWALD:  That is current, Your Honor.

13          THE COURT:  Well, what's the status of that property?

14          MR. GREENWALD:  That property, that is the -- there is

15     a contract for sale that has been circulated.  And that would

16     generate money to the estate.

17          THE COURT:  How much -- what's the contract amount?

18          MR. GREENWALD:  Approximately 175,000 dollars.

19          THE COURT:  What's the amount of the secured claim?

20       (Pause)

21          MR. GREENWALD:  That's 475, Your Honor.

22          THE COURT:  The amount of the claim is 475.

23          MR. GREENWALD:  Of the mortgage is 475.

24          THE COURT:  Okay.  And what is the amount of the

25     proposed sale?

1          MR. GREENWALD:  I believe the amount of the sale is

2     approximately 6.

3          MR. FISCHMAN:  690.

4          MR. GREENWALD:  690.  So it'll be more than 475.  It

5     could be more than 175.

6          THE COURT:  What about 572-574 Madison?

7          MR. GREENWALD:  That is current, Your Honor.  However,

8     the debtor is considering selling it.

9          THE COURT:  All right.  But it's not under contract?

10          MR. GREENWALD:  No.

11          THE COURT:  Okay.  304 Washington Avenue.

12          MR. GREENWALD:  304 Washington.  Your Honor had

13     granted relief from the automatic stay to proceed up to sale.

14     As Mr. Fischman testified, there were longstanding negotiations

15     with this creditor.  He is in a position to reinstate it.

16     However, despite both of our efforts -- and I've been asking

17     for months to get the amount of how much it takes to reinstate

18     the mortgage -- how much cure to reinstate the mortgage and it

19     has not been provided.

20          THE COURT:  Have you done anything like -- is there a

21     bar date set in this case?

22          MR. GREENWALD:  Your Honor, yes, we did do a bar date.

23          THE COURT:  Well, if you needed to get information

24     from a creditor, you could get it -- you could come to court

25     and seek that.

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1         MR. GREENWALD:  Your Honor, we considered doing a 2004

2    order.  But based upon my relationship with Mr. Weiner, I

3    believe we would hopefully be able to avoid that.

4         THE COURT:  All right.

5         MR. CURTIN:  Your Honor, I got a call from Mr. Weiner

6    yesterday and he represented that there were offers made by the

7    debtor and all those offers had been rejected and that they

8    were proceeding to foreclosure in the beginning of December.

9         MR. GREENWALD:  Those were different offers --

10        MR. CURTIN:  That was as of last night.

11        MR. GREENWALD:  That was not --

12        MR. CURTIN:  That was last night, Your Honor.

13        MR. GREENWALD:  That was not -- what was being

14    discussed there, Your Honor, was not the issue of

15    reinstatement.  Your Honor, forgive me if I don't disclose what

16    the settlement discussions were.  But they did not go into

17    reinstatement.  There were actually more than introductory

18    participations by Haven.  So we are in a position to reinstate

19    that mortgage.

20        THE COURT:  You are in a position to.  What do you

21    mean?

22        MR. GREENWALD:  Yeah.  We will -- Mr. Fischman

23    testified that he will have the money available to reinstate

24    that mortgage to file the plan.

25        And in response to your question of when to file --

1   when we would be filing the plan, Your Honor, we had been

2   working towards getting in a position where we can look to

3   solve the economic problems of this case which is the real

4   estate.  We're now in a position to file a plan based upon the

5   real estate transactions that have been described which include

6   reinstatement, having profit -- being self-sustaining, selling

7   properties, getting an investor in Yakaputz which will make

8   that self-sustaining as well or more so sustaining and cure it.

9   So we're now in a position to do a plan.  And I can say that we

10  can put a plan of reorganization before Your Honor within

11  thirty days.

12          MR. CURTIN:  Your Honor, I have to respond to this.

13  Just with regard to 304 Washington, they're talking about

14  having -- being in a position to reinstate the mortgage.

15  There's no money, Your Honor.  I don't know what they're

16  talking about.  They made some allusion to borrowing money from

17  a friend of Mrs. Fischman's wife (sic).  I don't know whether

18  this is the same friend that -- the Court may have noticed that

19  they attempted to -- attempting to retain to negotiate

20  mortgages.  Obviously, we would object to that if the case

21  isn't converted.

22          But, Your Honor, these are all great points.  But what

23  it really comes down to is the debtor violated the order, cause

24  exists and even if the Court were to determine that a plan

25  could be confirmed within a reasonable time frame, the Court

1    would also have to find that there was a reasonable

2    justification for disobeying the order.  And all we have is

3    that the orders went over his head.

4              THE COURT:  Yeah.

5              MR. CURTIN:  So it's a lot of talk about --

6              THE COURT:  Um-hmm.

7              MR. GREENWALD:  Your Honor, the -- my understanding is

8    the person who is providing the financing is different than the

9    former banker who they would like to have negotiate eight

10   mortgages.

11             THE COURT:  Is there anything else you want to put on

12   the record?

13             MR. GREENWALD:  If I can just speak one second with my

14   client, Your Honor?

15       (Pause)

16             MR. GREENWALD:  Your Honor, as I think we've

17   discussed, there are buildings that are self-sustaining.

18   Reorganization is feasible or can do -- is possible.  It is

19   premature to convert this case now because we're really talking

20   about the Fischmans who have been in for a little more than

21   five months, maybe just around five months.  And they've been

22   getting this case in order and are now in a position to do the

23   plan.  That the issue is are you able -- as far as conversion

24   is concerned, generally, the issue is, is it possible to have a

25   reorganization.  And here, the answer is yes, it is.

1      THE COURT:  Well, I think the question -- that's not

2  the standard in the statute.

3      MR. GREENWALD:  I understand that.

4      THE COURT:  It's not the standard in the statute as

5  whether it's possible to have a reorganization.

6      MR. GREENWALD:  Yes.  Your Honor, I agree  --

7      THE COURT:  It's whether there's a reasonable

8  likelihood that a plan will be confirmed within a reasonable

9  time.  And that is a higher standard than "possible", much

10  higher.

11      MR. GREENWALD:  Although the standard is based upon

12  where you are in the context of the case.  If this case was a

13  year old then the standard is higher.

14      THE COURT:  Six months into the case?  That's long

15  enough.  That's long enough to have -- particularly, in the

16  context -- you know, in the absence of a clause to convert the

17  case, maybe there wouldn't -- I wouldn't be converting it

18  necessarily just because you hadn't filed a plan at this point.

19  But in the absence of -- given the existence of cause to

20  convert the case then the burden falls on the debtor to make a

21  showing.

22      MR. GREENWALD:  Your Honor, then, if nec -- Your

23  Honor, I would prefer to be able to file a plan in thirty days.

24  But if I have to file a plan in two weeks, I'll do it.

25      THE COURT:  You -- this motion was filed three weeks

Page 72

1   ago, a month ago, right?

2          MR. CURTIN:  Yes, Your Honor, a month ago.

3          THE COURT:  A month ago.  You had -- this is your

4   opportunity to make that showing.

5       (Pause)

6          MR. GREENWALD:  Your Honor, the -- as I said, I'm sure

7   the Court is aware, the real estate market is a business.  And

8   that Mr. Fischman has been working very hard to try and sell

9   these properties and hopefully generate some equity to pay

10  creditors and maybe to keep himself going.  A trustee -- a

11  Chapter 7 trustee will not get anything more for these

12  properties than will Mr. Fischman.  It is not in the best

13  interest of creditors to convert.

14         THE COURT:  That isn't the standard either.  Well,

15  unless you say -- I guess it is whether it's in the best

16  interest of creditors to convert or dismiss.  The other

17  possibility would be to appoint a Chapter 11 trustee.

18         MR. GREENWALD:  Your Honor, I think that would be

19  preferable to conversion.

20         THE COURT:  You have a view on that, Mr. Curtin?

21         MR. CURTIN:  Yes, Your Honor.  I disagree.  I think

22  conversion, as outlined in the motion, is the most appropriate

23  remedy.  And as I mentioned, they're --

24         THE COURT:  Why do you think it's preferable to

25  appointing a Chapter 11 trustee?

Page 73

1          MR. CURTIN:  Why do I --

2          THE COURT:  Excuse me.  Do you have anything else?

3    I'm giving you now -- complete your remarks and sit down, if

4    you would.

5          MR. GREENWALD:  Thank you, Your Honor.  It's my

6    understanding that dismissal is not an option.  If dismissal

7    was an option, we would probably consent to dismissal.  If we

8    are looking at a liquidation or an 1104 trustee, we would

9    prefer an 1104 trustee.  Thank you, Your Honor.

10        (Pause)

11         MR. CURTIN:  Your Honor, to answer your question,

12   first of all, if the Court is inclined to appoint a Chapter 11

13   trustee, obviously I'm not going to jump on the table about

14   that.  But we --

15         THE COURT:  Well, I want to know your thinking --

16         MR. CURTIN:  Yes.

17         THE COURT:  -- about why you say conversion, not 11

18   trustee, not dismissal.

19         MR. CURTIN:  Well, there's a couple reasons, Your

20   Honor.  It really has to do with the numbers.  And Your Honor

21   touched on a lot of those.  But this is a case where it doesn't

22   seem -- and nobody has a crystal ball and can predict what will

23   happen.  But what it seems like is that these properties -- Mr.

24   Fischman is a -- has a business other than these -- other than

25   these buildings.  And these buildings, quite frankly, based on

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1   what the numbers show, need to be sold.  And there's not --

2   it's not a position -- it's not a case where, as Your Honor, I

3   think, went through when you were questioning the debtor based

4   on -- or Mr. Greenwald based on the schedules -- it's not a

5   case where there's some what we sometimes refer to as a White

6   Knight property where there's this ball of equity that can be

7   used to pay off loans on some of the other properties.  It's

8   simply not that case.

9           And, Your Honor, I think, quite frankly, what would

10  happen is if we appointed a Chapter 11 trustee, I think it

11  would be converted pretty soon after that anyway.

12          THE COURT:  Well, then why not -- why are you

13  convinced that dismissal is inappropriate?  Each of -- the

14  assets of this entity consist of secured debt, basically, that

15  is -- rather, properties that are subject to secured claims.

16          MR. CURTIN:  Your --

17          THE COURT:  There is unsecured debt, personal debt of

18  Mr. and Mrs. Fischman, but, you know, I question whether they'd

19  get much in a 7 anyway.

20          MR. CURTIN:  Your Honor, you may be right.  But my

21  point is that it's worth a shot.  It's worth a shot to convert

22  the case, appoint a trustee.  Your Honor, I've outlined ten

23  pages of disclosed transactions that were inappropriate.  Who

24  knows what else there is?  Who knows what causes of action

25  exist for a trustee to pursue?  And if there's nothing there,

1   there's nothing there.  But it's not a case in our view that

2   should simply be dismissed.  And quite frankly, I don't know

3   that benefit is sufficient.  I think out of the three,

4   dismissal is probably the worst for them.  But that's not my

5   place to say.  And we ask for conversion.  A trustee -- and if

6   the trustee -- the Chapter 7 trustee wants to operate, there's

7   obviously a means for him or her to do that.

8            THE COURT:  All right.  Did you want to say something?

9            MR. NAGI:  Yes, Your Honor.  Jason Nagi on behalf of

10  City National Bank.  With respect to the three properties, City

11  National Bank has a secured collateral.

12           THE COURT:  And which are those?

13           MR. NAGI:  That's 866 Madison Avenue.  That's the one

14  where there's a proposed short sale.

15           THE COURT:  Uh-huh.

16           MR. NAGI:  Prevention I, which is 508 Madison Avenue.

17  And then 572-574 Madison Avenue where there's no contract.  But

18  the one thing that we would like to point out is that four

19  months on Prevention -- for four weeks, there's been a contract

20  on Prevention Inc.  Nothing has been showed to the Court.  So

21  we've heard talk about it but --

22           THE COURT:  So your client has a mortgage on all three

23  properties?

24           MR. NAGI:  On all those three properties.

25           THE COURT:  Is it to secure -- are they separate

1    mortgages or one that covers all three?

2         MR. NAGI:  They're separate mortgages.

3         THE COURT:  Okay.  And are you the senior lender on

4    these properties?

5         MR. NAGI:  We are.  I don't believe that there's a

6    second lien lender but I've had this case for about a day and a

7    half so it's really hard to --

8         THE COURT:  All right.

9         MR. NAGI:  -- to get all the facts in time for this

10   hearing.

11        THE COURT:  Okay.  Continue what you were going to

12   say.

13        MR. NAGI:  Sure.  We fully intend to be involved.  And

14   from what it looks like, I think that City National Bank would

15   be inclined to move to lift the stay for these properties

16   because we do not believe that there is a reorganization that's

17   reasonably within prospect within a reasonable amount of time.

18   And that's really all that I would like to add to the Court at

19   this time.

20        THE COURT:  All right.

21        MR. NAGI:  If I may just approach to provide my card.

22   I can do it after if Your Honor would like.

23        THE COURT:  Why don't you wait?

24        MR. NAGI:  Sure.

25        THE COURT:  All right.  Anybody else want to say

1    anything?

2           MR. CURTIN:  No, Your Honor.

3           MR. GREENWALD:  If I may?

4           THE COURT:  Yes.

5           MR. GREENWALD:  To be very brief.  If we can have a

6    month to put this together, adjourn Your Honor's decision so we

7    can do what we say we're going to do -- and we'll, of course,

8    work with counsel, the U.S. trustee's office.  So this way we

9    can make the motions, we'll get the plan of reorganization.

10          THE COURT:  Okay.

11          MR. GREENWALD:  Thank you.

12          THE COURT:  All right.  This is my ruling on the

13   United States trustee's motion to convert or dismiss Mr. and

14   Mrs. Fischman's individual case.  I think the record clearly

15   shows that the trustee has demonstrated that there is cause to

16   convert or dismiss this case as outlined in Section 1112(b)(4)

17   in that there was failure by the debtor to comply with two

18   orders of the Court.  The argument is made that they were

19   complied with but complied with late.  As to one of them, I

20   don't believe it was complied with at all but if it was

21   complied with, it was complied with two months late.  And the

22   other one, the same is true.  If there was compliance, it was

23   substantially late.  And the order set a deadline.  The

24   deadline had to be complied with.  As with respect to -- I

25   should say -- the second order, I guess, was the order that

1   required reporting as to Carriage House.  And that was never

2   complied with except, I guess, to the extent that Mr. Greenwald

3   may have included the information in the response to the

4   motion.  But in either event, there was not compliance with the

5   terms of the order.  And -- so there is cause as outlined in

6   Section 1112(b)(4) to convert or dismiss this case.  No

7   question about it.  It is crystal clear on the record that

8   there has been a failure to comply with an order of the Court

9   and not a one-day mistake but a multiple-day mistake, multiple-

10  day failure to comply.

11          And disclosure in the context of a Chapter 11 case,

12  particularly a case where the debtor owns multiple properties

13  in multiple entities commingles funds where there has been

14  history of funds going back and forth -- disclosure is key.

15  And that is why these orders were entered.  And they were not

16  complied with.  And that is conceded.

17          So that that leaves us to the question of whether the

18  debtor has established that there is a basis under Section

19  1112(b)(2) to not con -- to defer or not to convert the case or

20  to dismiss the case based on satisfaction of the prongs under

21  1112(b)(2)(A) and (B).  And 1112(b)(2)(B) requires that in

22  order to avoid the mandatory consequence of conversion or

23  dismissal, the debtor has to establish or some other party has

24  to establish that the grounds for relief include an accurate

25  omission for which there exists a reasonable justification for

1    the act or omission and that will be cured within a reasonable

2    period of time.

3         I don't find that the debtor saying that the orders

4    went over his head, that he blanked out on them, that he didn't

5    understand is a reasonable justification.  Mr. Fischman is a

6    Chapter 11 debtor.  He's undertaken the responsibility to

7    function as a debtor-in-possession and he is held to that

8    standard.  He is assisted by two professionals, by an attorney

9    and an accountant.  The idea that he thinks that he can tell me

10   that it just went over his head and that is somehow going to be

11   a reasonable excuse for not complying with an order is simply

12   an unacceptable excuse.  And I don't consider that to be an

13   excuse that constitutes a reasonable justification for failure

14   to comply with two separate court orders requiring reporting.

15        Nor do I believe that Mr. Fischman's testimony has

16   established that there is a reasonable likelihood that a plan

17   will be confirmed within a reasonable time.  He has talked

18   about various real estate transactions that he is contemplating

19   although there's been no documentary proof that substantiates

20   any of -- that proffers -- that substantiates any of the

21   testimony that he's made concerning transactions that he

22   thinks -- that he hopes to enter into is, I'd say, speculative

23   at this point.  And it is entirely unclear whether any of these

24   transactions will either be accomplished or whether they would

25   yield any benefit that would be able -- that would make it

Page 80

1  possible for the debtor to reorganize.  And certainly no

2  outline has been proffered as to how that would -- how that

3  exactly that would accomplish, what would be paid to unsecured

4  creditors, anything of that nature.  So I think that the

5  testimony that's proffered, the unsubstantiated testimony

6  that's been proffered does not satisfy, in my view, the

7  requirement of establishing that there is a reasonable

8  likelihood that a plan will be confirmed within a reasonable

9  time.

10          For that reason, I am granting the motion by the

11  United States trustee.  And I agree with the United States

12  trustee that, in these circumstances, conversion is the more

13  appropriate alternative.  I think that there -- although I

14  would consider the possibility of a Chapter 11 trustee, I think

15  there is probably -- it probably doesn't make much of a

16  difference because a Chapter 7 trustee, as Mr. Curtin has --

17  this is really a liquidating case either way.  So a Chapter 7

18  trustee can operate the business and a Chapter 11 trustee can

19  sell assets.  So in this instance, I think that since this is

20  really fundamentally a liquidating case that it is appropriate

21  to appoint a Chapter 7 trustee.

22          MR. GREENWALD:  Your Honor, Mr. Fischman asked if he

23  could address the Court.

24          THE COURT:  I've made my ruling.

25          MR. GREENWALD:  Okay.  Thank you.  Mr. Fischman had

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1   indicated to me that if Your Honor granted the relief you have

2   that he would want to take an appeal.  Accordingly, I'd ask the

3   Court would grant a stay pending appeal.

4          THE COURT:  You will have to explain to me why there

5   would be grounds for a stay pending appeal.

6          MR. GREENWALD:  Well, there would be substantial

7   prejudice to the debtor if the trustee were to come and take

8   hold and start selling properties before the appeal was

9   determined.  The actions by a Chapter 7 trustee can regularly

10  render the decision on appeal moot and make the appeal

11  dismissible for moot.  So there's substantial prejudice to the

12  debtors by not maintaining the status quo.

13         THE COURT:  So you think a Chapter 7 trustee is going

14  to come in and sell things tomorrow?

15         MR. GREENWALD:  I do not think a Chapter 7 trustee

16  will come and sell things tomorrow.  However, considering how

17  long appeals can take, it is possible that sales will occur

18  before then or the trustee might take action which would impact

19  upon existing deals and the debtors well-being in the meantime.

20         THE COURT:  I'm going to respectfully deny this --

21  well, I'll hear from Mr. Curtin.  Mr. Curtin, what's your view

22  on a stay pending appeal?

23         MR. CURTIN:  Your Honor, we oppose it.  And the prong

24  that hasn't been addressed is the reasonable likelihood of

25  success.  And I would submit that based upon Your Honor's

1    ruling, it's cut and dry.  There is no reasonable likelihood of

2    success.  There really is no possibility of success in our

3    position.  So, Your Honor, for those reasons -- Your Honor

4    would have to find both that and the harm.  So you don't even

5    need to get to the harm if you don't find the reasonable

6    likelihood.

7         THE COURT:  Well, I think that Mr. Curtin is correct

8    that there is not a reasonable likelihood of success nor even a

9    fair prospect of success on appeal given the fact that there

10   has been clear noncompliance with orders of the Court.  So

11   there is admittedly, I think -- there's been admitted that

12   there is noncompliance.  So I think there's clearly grounds

13   under 1112(b).  And it is, to me, equally clear that for the

14   debtor-in-possession to say that orders of the Court went over

15   his head or that he blanked out or something of that nature

16   does not constitute a reasonable justification for a failure to

17   comply with an order of the Court.

18        MR. GREENWALD:  Your Honor --

19        THE COURT:  So --

20        MR. GREENWALD:  -- in which case?  If Mr. Fischman --

21        THE COURT:  Nor do I think that there is an immediate

22   prospect of irreparable harm if a Chapter 7 trustee is

23   appointed because I know that the debtor will be able to

24   communicate with the Chapter 7 trustee.  If the debtor feels

25   that there is a transaction that the debtor thinks would be

1    more favorable for the estate, you can make a motion at that

2    point.  So I don't -- you can seek Court approval.  You can

3    seek --

4            MR. GREENWALD:  If there's a motion for a sale, the

5    debtor can object to it.

6            THE COURT:  Can object to it.

7            MR. GREENWALD:  I understand.

8            THE COURT:  If the debtor has a transaction, the

9    debtor can propose that transaction.  Debtor can seek

10   reconversion to an 11 if you have a plan.

11           MR. GREENWALD:  Your Honor, again, Mr. Fischman asks

12   if he can address Your Honor.

13           MR. FISCHMAN:  I have something I would like to say,

14   Your Honor.

15           THE COURT:  All right.

16           MR. FISCHMAN:  Do I need to go into that place or -- I

17   would just like to say that I feel I'm being denied due

18   process.  And as a result of that, I'm going to file an appeal

19   with an interlocutory -- it's going to be an interlocutory

20   adversary appeal that I'll be filing because I feel I am not

21   being granted due process here.  We are in the process of

22   getting things done.  We're in the process of solving this 11

23   and we're not being given the time.  I feel I'm not being given

24   due process here, Your Honor.  And for that reason, unless Your

25   Honor will reconsider, I will be filing an appeal and it will

1    be an interlocutory adversary appeal.  So I would like Your

2    Honor to reconsider this and give us at least one more month to

3    bring to fruition everything we say we can do.

4              THE COURT:  I'm not changing my ruling.

5              MR. FISCHMAN:  I'm sorry?

6              THE COURT:  I am not changing my ruling.

7              MR. GREENWALD:  Your Honor, I appreciate Your Honor

8    considering the motion for the stay pending appeal.

9    Considering that Your Honor has denied it --

10             THE COURT:  I have denied it, yes.

11             MR. GREENWALD:  -- if Mr. Fischman seeks a stay

12   pending appeal, he would like to go directly to the district

13   court as opposed to having to first come here which Your Honor

14   has already denied the motion.

15             THE COURT:  Yes.

16             MR. GREENWALD:  So we may go directly to the district

17   court?

18             THE COURT:  Yes, you may.

19             MR. GREENWALD:  Thank you very much, Your Honor.

20             THE COURT:  All right.  Mr. Curtin, will you submit

21   your order, please?

22             MR. CURTIN:  Your Honor, I submitted one with the

23   motion.  But I can submit another one.

24             THE COURT:  Do you need to -- I mean, have we received

25   it in electronic form?

MICHAEL FISCHMAN AND SHOSHANNA FISCHMAN

1          (Pause)

2              MR. CURTIN:  Your Honor, I can upload it right when I

3    get back.

4          (Pause)

5              THE COURT:  All right.  Okay.  Thank you.

6              MR. CURTIN:  Thank you, Your Honor.

7              MR. GREENWALD:  Your Honor, thank you again.

8              THE COURT:  No.  I'm just converting the Fischman

9    case.  They will be under the jurisdiction of the trustee.

10         (Whereupon these proceedings were concluded at 5:22 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          I N D E X

3

4                      T E S T I M O N Y

5

6   WITNESS              EXAM BY              PAGE    LINE

7   Michael Fischman     Mr. Greenwald        24      5

8   Michael Fischman     Mr. Curtin           46      1

9   Michael Fischman     Mr. Greenwald        55      1

10

11

12                      R U L I N G S

13  DESCRIPTION                               PAGE    LINE

14  Motion of the Chapter 11 trustee to convert    80      10

15  the case (no. 10-44189) to Chapter 7 granted;

16  Chapter 7 trustee will be appointed       80      21

17  Motion to lift stay pending appeal denied;     84      10

18  debtor may go directly to district court  84      18

19  and not have to come first to bankruptcy

20  court

21

22

23

24

25

1

2                     C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB (CET**D-486)

9    AAERT Electronic Certified Transcriber

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, New York 11501

15

16   Date:  November 10, 2010

17

18

19

20

21

22

23

24

25